IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-784

No. COA22-137

Filed 6 December 2022

Stokes County, No. 21 JA 11

IN THE MATTER OF: G.W.

Appeal by Respondent from an order entered 16 November 2021 by Judge
Thomas B. Langan in Stokes County District Court.  Heard in the Court of Appeals
21 September 2022.

*Sean P. Vitrano, for the Respondent-Appellant.*

*Leslie Rawls, for Stokes County Department of Social Services, the Petitioner-Appellee.*

*GAL Appellate Attorney James N. Freeman, Jr., for the Guardian ad Litem.*

WOOD, Judge.

¶ 1        Respondent-Mother ("Mother") appeals from an order filed on 16 November
2021 adjudicating her child "Grace"[1]  as neglected. Because we hold there is sufficient
evidence to support the trial court's findings of fact, which in turn support the trial
court's conclusion of there being a substantial risk of future neglect for Grace, we

---

[1] We use pseudonyms to protect the child's identity and for ease of reading.

affirm the adjudication order of the trial court.

## I. Factual and Procedural Background

Mother and Father[2] are the parents of three daughters: "Anita," "Hayley,"[3] and Grace. On 18 December 2018, Surry County Department of Social Services ("Surry County DSS") opened an investigation into allegations of neglect due to improper care. The parents were alleged to have given Hayley improper foods, to have dipped the baby's pacifier in Benadryl, refused to take parenting classes, and to be improperly feeding the baby, who was not gaining weight properly.

On 3 July 2020, DSS opened an investigation after receiving a report that Mother and Father had accidentally spilled bleach in Anita's eyes while cleaning near her crib. Their home was found to be cockroach-infested, having holes in the floors, and bags full of trash sitting in the home. On 6 July 2020, Mother and Father were charged with felony child abuse and agreed to have their children reside with a maternal great aunt.

Mother and Father moved to Stokes County and were contacted by a social worker from Stokes County DSS on 14 July 2020. On 11 August 2020, Surry County DSS learned of pending charges against the parents, including the charges of felony child abuse, misdemeanor possession of marijuana, and misdemeanor possession of

---

[2] Father is not a party to this appeal.
[3] We use pseudonyms to protect the children's identities and for ease of reading.

marijuana paraphernalia. On 21 August 2020, a social worker reviewing records from Surry County learned that Father had been diagnosed with PTSD and paranoid schizophrenia that was untreated, that he was reported to have stabbed someone because "the guy was going to try and kill him," and that "he used to be in the Arian [sic] Brotherhood gang."

¶ 5      The social worker also learned that Mother has a history of intellectual disability, bipolar disorder, intermittent explosive disorder, and borderline personality disorder. She was referred for a psychological assessment, and it was recommended a guardian be assigned to her. On this same day, Stokes County DSS filed petitions alleging that Graces' sisters, Anita and Hayley, were abused and neglected, and the children were placed in the nonsecure custody of the Stokes County DSS. Anita was two years old; Hayley was five months old; and Grace had not yet been born at this time. On 23 September 2020, the parents entered into a family services case plan in relation to Anita and Hayley.

¶ 6      Grace was born on 21 January 2021, and, although Grace's urine screen was negative, Mother tested positive for marijuana and oxycodone at her birth. Because the hospital is located in Forsyth County, Forsyth County DSS came to the hospital to investigate the report. When the social worker initiated contact, Mother immediately stated she would be leaving the hospital. Father "became irate" with hospital staff and the social worker such that security had to be called. The hospital

refused to allow Grace to be discharged when Mother and Father attempted to leave with her. Stokes County DSS filed a petition alleging Grace was a neglected juvenile due to living in an environment injurious to her welfare. On this same day, Grace was removed from Mother and Father's custody pursuant to a nonsecure custody order and placed in the custody of Stokes County DSS.

¶ 7        According to the petition, Stokes County DSS received a CPS report on the day Grace was born alleging that Mother and Father had not followed recommendations from their out of home family services case plan concerning their "parenting psychological[,] . . . ha[d] not completed parenting classes and [were] not involved in mental health services." The petition also alleged that the parents changed their stories several times about what happened to their other children and that hospital staff reported the parents were "acting sketchy and paranoid, and [were] not wanting anyone in their room." The petition further stated that the parents had a positive drug screen on 19 November 2020, for marijuana and that Mother had a positive screen for marijuana and opiates in December 2020.

¶ 8        On 9 February 2021, the trial court ordered that (1) Grace shall remain in the nonsecure custody of DSS; (2) the parents shall meet with Stokes County DSS worker, Ms. Wanda Pearman, to explore services for themselves; (3) Stokes County DSS shall conduct a home study of the relative identified by the parents for home and kinship suitability; and (4) "Parents shall address the tasks of the case plans in 20 JA 98 and

99" for their other two children. The parents were allotted two hours per week of supervised visitation with Grace to take place with her sisters who were also in the custody of DSS. On this same day, the trial court appointed a Guardian *ad litem* on behalf of Mother "based on the previous order and the [8 October 2020] report from Dr. Bennett" of Carolina Piedmont Psychological Associates. According to Dr. Bennett, Mother has "limitations to her cognitive capacity and that she would benefit from someone who could help her understand the legal proceedings" because she "does not understand the consequences of her decisions but she is easily influenced[.]"

¶ 9        On 25 February 2021, the trial court granted Stokes County DSS' motion to amend their juvenile petition for Grace. The amended petition added the following allegation: on 26 January 2021, Grace's umbilical cord tested positive for THC, oxycodone, noroxycodone, oxymorphone, and noroxymorphone. On this same day, Anita and Hayley were adjudicated neglected with the consent of Mother and Father. On 26 March 2021, Mother's attorney filed a motion to strike, motion to dismiss, motion to set aside, and answer to the juvenile petition. The adjudication hearing set in April was continued until June and then August due to Father being homebound by a physician's orders after a serious moped accident resulted in the amputation of his leg and left him wheelchair bound.

¶ 10        On 26 August 2021, the trial court conducted an adjudication and disposition hearing. The trial court adjudicated Grace to be a neglected juvenile due to living in

an "injurious environment, condition of home, — filthy, holes in floor." Additionally, the trial court found there was a substantial risk of future neglect and that her parents had failed to address the conditions which resulted in the removal of their two older children. The court determined that legal custody and physical custody of Grace should remain with Stokes County DSS.

¶ 11        In its disposition, the trial court ordered that (1) both Father and Mother obtain substance abuse assessments and comply with the recommended treatments; (2) Mother obtain a mental health assessment and comply with recommended treatment; (3) both parents attend individual counseling and Father specifically attend anger management courses; (4) parents comply with the provisions of their family services case plan entered on 23 September 2020 in relation to their two older children; (5) parents maintain a suitable residence, including making necessary repairs; (6) parents utilize YVEDDI transportation services; and (7) the parents comply with recommendations made by Dr. Bennett in their psychological assessments. The trial court further ordered that parents would continue to have visitations with their children on a weekly basis for a two-hour duration at DSS, until such time as "holes in floor [of home were] repaired."

¶ 12        The formal adjudication judgment and dispositional order was filed on 16 November 2021. Mother gave notice of appeal on 8 December 2021.

## II.    Analysis

Mother contends the trial court's conclusion that Grace faced a substantial risk of future neglect was unsupported by clear and convincing evidence, and therefore, it was error to adjudicate her a neglected juvenile. She also contests several findings of fact and conclusions of law in the adjudication order. However, Mother does not challenge the disposition order.

The purpose of an adjudication hearing is to adjudicate "the existence or nonexistence of any of the conditions alleged in a petition." N.C. Gen. Stat. § 7B-802 (2021). Thus, post-petition evidence is admissible for consideration of the child's best interest in the dispositional hearing, but generally not for an adjudication of neglect. *In re A.B.*, 179 N.C. App. 605, 609, 635 S.E.2d 11, 15 (2006). In reviewing a non-jury adjudication of neglect, "the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some evidence supports contrary findings." *In re K.D.,* 178 N.C. App. 322, 327, 631 S.E.2d 150, 154 (2006) (citation omitted). Additionally, uncontested findings of fact "are deemed to be supported by the evidence and are binding on appeal." *In re J.C.M.J.C.,* 268 N.C. App. 47, 51, 834 S.E.2d 670, 673-74 (2019) (citation omitted). This Court reviews the trial court's conclusions of law to determine whether they are supported by the findings of fact. *In re W.C.T.*, 280 N.C. App. 17, 2021-NCCOA-559, ¶ 27. The determination of whether a child is neglected is a legal conclusion that is reviewed *de novo*. *In re K.L.*, 272 N.C. App. 30, 36, 845 S.E.2d 182, 189 (2020). "An appeal *de*

*novo* is one 'in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings.' " *In re K.S.*, 380 N.C. 60, 2022-NCSC-7, ¶ 8 (quoting *Appeal De Novo*, Black's Law Dictionary (11th ed. 2019)). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court." *Id.* (cleaned up).

¶ 15 A "neglected juvenile" is defined by statute as:

> [a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker . . . [c]reates or allows to be created a living environment that is injurious to the juvenile's welfare . . . . In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15) (2021). "[I]n order for a court to find that the child resided in an injurious environment, evidence must show that the environment in which the child resided has resulted in harm to the child or a substantial risk of harm." *In re K.J.B.*, 248 N.C. App. 352, 354, 797 S.E.2d 516, 518 (2016) (citation omitted).

¶ 16 When "neglect cases involv[e] newborns, 'the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of

the case.'" *In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698-99 (2019) (quoting *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999)). Otherwise,

> [t]o hold that a newborn child must be physically placed in the home where another child was abused or neglected would subject the newborn to substantial risk, contrary to the purposes of the statute. Thus, a newborn still physically in residence in the hospital may properly be determined to "live" in the home of his or her parents for the purposes of considering under N.C. Gen. Stat. § 7B-101(15) whether a substantial risk of impairment exists to that child.

*In re A.B.*, 179 N.C. App. at 611, 635 S.E.2d at 16.

## A. Challenged Findings of Fact.

### 1. Finding of Fact 5

Mother contends that several findings were unsupported by clear and convincing evidence. She objects to portions of finding of fact 5 which suggest that she and Father "were not complying with their case plans or Dr. Bennett's recommendations" when the neglect petition was filed on 22 January 2021. Mother specifically contests the portion of finding of fact 5 which states: "Regarding their case plans for the older two children, the parents have not followed the terms of their parenting psychological[ ] [evaluations], they have not completed parenting classes, and they are not involved in mental health services."

Mother argues this finding is unsupported because she and Father "were complying with several aspects of their case plans, and the record does not establish

that parenting classes were offered to them before the petition was filed." We disagree.

According to the record before us, the trial court did not require either parent to enter into a new case plan for Grace, but rather it required only that the parents continue working on the case plans entered on 23 September 2020 for their two older children. While Mother and Father have complied with some aspects of their case plans, "compliance with a portion of [their] case plan does not preclude a finding of neglect." *In re N.B.,* 377 N.C. 349, 2021-NCSC-53, ¶ 20 (internal citation omitted).

Clear and convincing evidence supports the trial court's findings that neither Mother nor Father had complied with the recommendations of the evaluating psychologist, Dr. Bennett. In regard to Mother, Dr. Bennett recommended she have: (1) a psychiatric consultation to review her diagnosis and treatment, which was scheduled for 6 October 2020, then rescheduled to 17 November 2020, with Mother ultimately not attending the appointment; (2) counseling to treat her depression and explore parenting behaviors that would allow her to safely care for her children, in which Mother attended one therapy session in September 2020, but did not schedule a follow up appointment; (3) random drug testing, which of four tests taken prior to the petition, Mother tested positive for cannabinoid and THC once on 19 November 2020; and (4) Mother demonstrate stability in her life including having stable housing to support caring for her children, which the testimony of social workers revealed that

holes were present in the home's floors as early as 3 July 2020 and as recently as early August 2021.

¶ 21 In regard to Father, Dr. Bennett recommended: (1) a psychiatric evaluation to review and confirm his diagnoses and to evaluate for treatment options, which according to Father, he completed a week and a half before the August 2021 adjudication hearing; (2) random drug testing which of the four drug screens taken prior to the petition, Father had tested positive for THC and cannabinoid at each; and, (3) counseling to offer Father an opportunity to explore alternative behaviors both in parenting and in dealing with others. Ample clear and convincing evidence demonstrates that neither parent substantially complied with Dr. Bennett's recommendations or the mental health services requirements of their case plans. While record evidence supports Mother's contention that she and Father completed parenting classes prior to the July 2021 adjudication hearing, the classes were completed after the filing of the petition.

¶ 22 Post-petition evidence is admissible for consideration of Grace's best interest in the dispositional hearing, but not in the adjudication of neglect. *In re A.B.,* 179 N.C. App. at 609, 635 S.E.2d at 15. Notwithstanding Mother's contentions otherwise, the record shows that "[a] referral for the Nurturing Parenting Program . . . was completed and sent to the Children's Center of Northwest NC on September 23, 2020." Therefore, we conclude clear and convincing evidence in the record supports

the trial court's finding of fact 5.

### 2. *Findings of Fact 29, 30, 32, 35, 36, 37, 38*

¶ 23 Next, Mother objects to findings of fact 29, 30, 32, 35, 36, 37, and 38 because these findings describe events that occurred after the filing of the juvenile petition for neglect. Mother cites to this Court's previous holding in *In re V.B.* that held "post-petition evidence generally is not admissible during an adjudicatory hearing for abuse, neglect or dependency." 239 N.C. App. 340, 344, 768 S.E.2d 867, 869 (2015) (cleaned up). While Mother is correct that the purpose of an adjudicatory hearing is to determine only "the existence or nonexistence of any of the conditions alleged in a petition," the general rule that post-petition evidence is not admissible during the adjudication hearing is "not absolute." *Id.* at 344, 768 S.E.2d at 869-70. This court has previously determined that some post-petition evidence, like that which pertains to mental illness and paternity, does not constitute a "discrete event or one-time occurrence." *Id.* at 344, 768 S.E.2d at 870. Instead, conditions such as these have been determined by this Court to be "fixed and ongoing circumstance[s]" so that post-petition evidence about them is allowed to be considered in a neglect adjudication. *In re Q.M.*, 275 N.C. App. 34, 41, 852 S.E.2d 687, 693 (2020) (quoting *In re V.B.,* 239 N.C. App. at 344, 768 S.E.2d at 870). Likewise, the findings Mother challenges here relate in whole or in part to "ongoing circumstances" relevant to "the existence or nonexistence of conditions alleged in the adjudication petition." *In re V.B.,* 239 N.C.

App. at 344, 768 S.E.2d at 869-70; N.C. Gen. Stat. § 7B-802.

¶ 24    In finding 29, the trial court found, "the parents struggle to care for their three children during visitation, and social workers have intervened to prevent child injury." The implications of this finding are based upon post-petition evidence. Here, this finding relates to Mother and Father's continuous difficulties in properly caring for their children — difficulties that existed even prior to Grace's birth. Competent record evidence demonstrates that concerns regarding Mother and Father's parenting abilities had been ongoing since December 2018 when Surry County DSS initiated an investigation alleging neglect of Grace's older sisters. Indeed, the petition filed by DSS contained allegations regarding the parents' inability to care for Grace and this contested finding is relevant to the existence or nonexistence of conditions alleged in the petition.

¶ 25    Additionally, Mother contests finding of fact 30 which states, "Holes in the floor of the parents' home are safety concerns for the children, including [Grace]." Mother also challenges a similar portion of finding of fact 32: "In addition, the injurious environment of the parents' home, specifically holes in the floor, creates a safety hazard." Again, these findings also present an ongoing circumstance of home safety and the ongoing risk to Grace's safety. Clear and convincing evidence in the record demonstrates that there had been holes in the floor prior to Grace's birth. According to the initial neglect petition for Grace, on 3 July 2020, a social worker "observed

books scattered on the floor in various spots," and asked Mother why the books were on the floor. In response, Mother lifted one of the books for the social worker "to see the holes at least a foot in length and 3-4 inches in width." At that time, the social worker "observed 2-3 holes in the bedroom and bathroom [and] [Mother] stated [Grace's older sibling] is walking some now and they try to keep her safe." At the adjudication hearing, a social worker testified about the need for repairs to the parents' home, citing that there were "holes in the floor as recently as last week. [Mother] . . . reported that she fell through the floor in the kitchen. So that is a concern." Therefore, these findings of fact relating to the continuing risk to the child's safety is admissible post-petition evidence.

¶ 26        Next, Mother challenges several findings of fact addressing her and Father's progress on their case plans as post-petition evidence which, she argues, is generally not admissible during an adjudicatory hearing. The trial court addressed Mother's and Father's progress related to their mental health and parenting classes in findings of fact 35 and 36. Finding of fact 35 states, "Regarding [Father's] case plan for his older two children he reports he will begin therapy with Monarch soon. He completed parenting classes 7/14/2021." Regarding Mother's case plan for her older children, finding of fact 36 states, "she has not completed a psychiatric evaluation, nor has she engaged in counseling. She completed parenting classes 7/14/2021."

¶ 27        "[D]ue to the fact that mental illness is generally not a discrete event or one-

time occurrence," we find that Mother's and Father's failure to address their case plan goals concerning their mental health is relevant to the parents' ability to care for Grace. *In re V.B.*, 239 N.C. App. at 344, 768 S.E.2d at 870 (quoting *In re A.S.R.*, 216 N.C. App. 182, 716 S.E.2d 440, 2011 N.C. App. LEXIS 2166, at *11 (N.C. Ct. App. 2011) (unpublished)). Thus, the post-petition evidence of both Father and Mother not yet having begun therapy or taken measures to address their mental health concerns at the time of the adjudication hearing was relevant to the existence or nonexistence of conditions alleged in the petition. Therefore, we conclude these portions of the findings of fact are supported by competent evidence and may be considered at the adjudicatory stage.

¶ 28        Although Father and Mother finished parenting classes in July 2021, the courses were not completed before the adjudication petition was filed, so these portions of the findings constitute post-petition evidence. Parenting classes qualify as a discrete occurrence that occurs over a designated period of time; therefore, this evidence is not admissible at adjudication. Consequently, we disregard these portions of findings 35 and 36.

¶ 29        Mother further contests findings of fact relating to her and Father's substance abuse and drug screenings. Finding of fact 37 states, "[Father] tested positive for THC 9/23/2020, 10/12/2020, 11/19/2020, 11/28/2021 [sic], and 3/16/2021. He has not been tested since his accident [on] March 23, 2021. He asserts positive screens are

due to his CBD use." Finding of fact 38 states:

> [Mother] tested negative 9/23/2020, 10/12/2020, 1/28/2021,
> and 3/16/2021 on drug screens requested by DSS. She was
> positive 11/19/2020 for THC, a DSS screen. Her screen at
> [Grace's] birth on 1/21/2021 was positive for marijuana and
> opiates. She attributes the positive for THC to CBD use
> and the positive for opiates to prescribed medications.

Concerning Father's positive drug screens, we note that four of his positive drug tests were conducted prior to the filing of the adjudication petition, and evidence thereof may be considered at the adjudicatory stage. Likewise, Mother's drug screens conducted prior to the petition, including Mother's positive test for THC at Grace's birth may also be considered at the adjudicatory stage of the neglect petition. As to Father's and Mother's post-petition drug screens, we liken these to the admissibility of a parent's blood alcohol test at the adjudication stage. *Powers v. Powers* 130 N.C. App. 37, 46, 502 S.E.2d 398, 403-04 (1998). Like a blood alcohol test, a drug test is a discrete, one-time event as opposed to an ongoing condition. Therefore, the evidence of Mother's and Father's post-petition drug tests is admissible at disposition, but not at adjudication. *Id.*

### 3. Findings of Fact 32 and 33

¶ 30        Finally, Mother challenges the trial court's findings of fact 32 and 33 that Grace was at substantial risk of neglect. Mother argues that these contested findings of fact should be classified as conclusions of law because the determination that Grace

was at risk of neglect requires the exercise of judgment. *In re A.B.*, 179 N.C. App. at 612, 635 S.E.2d at 16 (citing *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997)). Finding of fact 32 states, "Considering the vulnerability of the young child, the cognitive limitations of the parents, and their history of rejecting medical and social services' advice, there is a substantial risk of future neglect. In addition, the injurious environment of the parents' home, specifically holes in the floor, creates a safety hazard." Finding of fact 33 states, "The parents' failure to address the terms of their case plans for their older two children, ages one and two, specifically mental health, creates a substantial risk of future neglect to [Grace]."

¶ 31        We agree with Mother that the above findings contain conclusions of law, but we hold that they should more properly be characterized as ultimate findings of fact since they are determinations of "mixed question[s] of law or fact." *In re C.A.H.,* 375 N.C. 750, 757, 850 S.E.2d 921, 926 (2020) (citation omitted). Further, we hold that the supported findings of fact and evidence establish that Grace was at a substantial risk of future harm.

¶ 32        Here, clear and convincing evidence supports the finding that Mother and Father failed to comply with medical and social services' advice and failed to comply with the terms of the case plans for their older two children such that a substantial risk of future neglect exists for Grace. Several unchallenged findings of facts support the trial court's conclusion of neglect and risk of future neglect. For instance, finding

of fact 9 states that on 22 January 2021, Mother "left the hospital against medical advice . . . . The child remained in the hospital without the parents."

An unchallenged finding of fact states that Father

> believes he is being targeted for his Nazi beliefs. In his personality assessment, [Father] presented significant levels of suspiciousness and paranoia. He has limited insight and ignores medical guidance and experts. He does not notice symptoms and hazards regarding children, which should be noticed by a parent. He has put his children at risk as a result, including placing a pot grinder in his child's crib to hide it from law enforcement, placing a bleach bottle on his baby's crib rail and spilling its contents into her eyes, and being unaware of his twenty-two[-]month old's severe tooth decay, despite warnings from medical professionals.

Similarly, uncontested findings state, "[Mother's] judgment is not sound, and she does not have the ability to protect her children. She fails to understand how her actions impact the health and safety of her children. She ignores medical guidance and does not notice the developmental delays of her older two children."

With respect to the risk of future neglect, the trial court also made multiple uncontested findings regarding the parents' inability to substantially comply with their case plans. For example, the court recognized Grace's vulnerability relating to her parents' drug use: "[M]other tested positive for marijuana and opiates at the child's birth, 1/21/2021. She was prescribed opiates . . . . [Grace's] umbilical cord was positive for marijuana, oxycodone, noroxycodone, oxymorphone, and

noroxymorphone." The uncontested finding also states Mother

> does not understand her actions led to the loss of custody of her older two children. She supports [Father]'s perceptions that she and her husband are being treated unfairly because they hold Nazi views, rather than examining her own behaviors and actions, which caused her children to be placed in DSS custody.

Whether another juvenile has been subjected to neglect by an adult who resides in the home is a relevant factor, and here, uncontested findings demonstrate that the "parents' older two children, ages one and two, are presently in the custody of the Stokes County Department of Social Services." Further, the court's uncontested findings demonstrate Grace faced a substantial risk of neglect if placed back into the custody of her parents at the time of the adjudication. Therefore, the clear and convincing evidence and the unchallenged findings of fact support the conclusion of law that Grace is a neglected juvenile at risk of future neglect.

### III. Conclusion

¶ 35    Based on the reasoning above, we hold that the clear and convincing evidence in the record supports the trial court's adjudicatory findings of fact and that the uncontested findings of fact and evidence support the trial court's conclusion that Grace is a neglected juvenile at risk of future neglect. Therefore, we affirm the trial court's order adjudicating Grace as a neglected juvenile.

AFFIRMED.

Judges TYSON and CARPENTER concur.